UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 2008-106 (WOB)

RONALD B. HALEY                                    PLAINTIFF

VS.                        OPINION AND ORDER

CITY OF ELSMERE, ET AL.                          DEFENDANTS


    This matter is before the court on the motion of defendants
for partial summary judgment.  (Doc. 47)

    Pursuant to the court's order of July 29, 2002 (Doc. 66),
the parties have advised the court that they desire that the
court proceed to rule on this motion, in lieu of staying the
claims at issue therein and proceeding to trial on plaintiff's
excessive force claim.  (Docs. 67, 68)

    Therefore, having previously heard oral argument on this
motion, the court now issues the following Opinion and Order.

### *Factual and Procedural Background*[1]

    Defendant, Brandon Marksberry, applied for the position of
police officer with the City of Elsmere on May 2, 2007.

    Officer Todd Cummins, Senior Sergeant, was responsible for
investigating the background and qualifications of applicants to

---

[1]Unless otherwise indicated, facts are recited according to
the testimony of plaintiff, the nonmovant.

the Elsmere Police Department. Cummins reviewed Marksberry's application, which indicated that he was certified by the Kentucky Law Enforcement Council ("KLEC") and had been employed with the Grant County Sheriff's Department as a Deputy Sheriff for two years. Because Marksberry was already certified by the KLEC, he was not required to take certain tests, but Cummins did require that Marksberry complete a Personal History Statement and a Candidate Questionnaire to provide further information concerning his education, employment, financial solvency, criminal background, and substance use. The information provided by Marksberry indicated:

- He graduated from high school in 1994, completed some college, and became certified by the KLEC in 2005.

- He had been employed by the Grant County Sheriff's Department for two years and was going to be laid off for budgetary reasons.

- He had worked for the Grant County Detention Center from 2001 to 2005 and left that position to take the job with the Grant County Sheriff's Department.

- He worked for Fidelity Investments in Covington from 1995 to 2000 and resigned at the company's request due to tardiness.

- He held several other jobs prior to working for Fidelity.

- He drinks alcohol a few times per year and had used marijuana, last in 1999, and in 1993-94 he used drugs other than marijuana on a recreational basis.

- In 1992-93, when he was a high school student, he was charged with possession of alcohol by a minor while on spring break.

Cummins then ran a background check on Marksberry, confirming that his driver's license was in good standing and that he had no criminal record.

Cummins next contacted Marksberry's former employers and co-workers, most of whom Cummins knew personally.  These included:

- Grant County Sheriff Chuck Dills, who told Cummins that Marksberry had been a "model employee."  Dills also provided Cummins with copies of the polygraph test, psychological evaluation, and drug test that Marksberry had been given when he was hired by the Sheriff's Department.

- Grant County Sheriff Deputy Troy Hagedorn who said that Marksberry would be a good hire for Elsmere.

- Kentucky State Trooper McDonald, who knew Marksberry. McDonald told Cummins that he was "very impressed" with Marksberry and had offered to recommend him for the State Police Academy.

- Grant County Sheriff's Deputy Brian Maines, a former co-worker, who told Cummins that Marksberry was a good deputy.

- Grant County Jailer Steve Kellam, who told Cummins that he believed Marksberry would be a good employee and that he had had no problems while employed by the Grant County Jail.  Kellam also told Cummins that Marksberry had been named a defendant in several lawsuits against the jail alleging excessive force, but that the FBI had investigated and determined that there was no basis to establish a federal criminal civil rights violation by Marksberry.  Kellam provided Cummins with a copy of a letter from the U.S. Department of Justice stating that conclusion.

- Grant County Deputy Jailer Tonya Beagle, a former co-worker, who "spoke highly" of Marksberry and said he had helped her a great deal in her job.

- Mike Esselman, who was Marksberry's supervisor at Fidelity Investments.  Esselman told Cummins that Marksberry was a hard worker, a good employee, and that

his work ethic was good.

Cummins, consistent with City policy, required Marksberry to undergo a psychological evaluation as part of the hiring process. The report from this evaluation stated that Marksberry was an "adequate" candidate for the position, but noted that care should be taken to manage any "moodiness" to which he might be prone.

Cummins, along with Chief Timothy Greene, also interviewed Marksberry. Chief Greene then recommended that City Council hire Marksberry. The City Council did so, and Marksberry began his new position on June 23, 2007.

**B.   Marksberry's Arrest of Plaintiff**

On August 12, 2007, plaintiff, Ronald B. Haley, went to the American Legion Hall in Elsmere, Kentucky around 9:30 or 10:00 p.m., where he participated in karaoke, drank two beers, and ordered a shot of Jagermeister. Earlier that day, plaintiff had taken Percoset, a drug prescribed for him by his physician, which he took regularly to treat several health issues. (Plf. Depo. 14)[2] Plaintiff testified that he began to feel hot and nauseous around 11:30 p.m., so he walked outside, carrying the Jagermeister, and squatted by his car. Around this time, plaintiff's friend, Angela Ellis, pulled into the lot and parked beside him.

_____

[2]There are two volumes of plaintiff's deposition (Doc. #60, #61). All citations herein are to the second volume, unless otherwise noted.

Officer Marksberry was conducting a routine check of the area, in part because neighbors had complained of loud noise and drug use on the American Legion property. Marksberry also knew that the American Legion maintenance man had asked that the police watch the parking lot in the wake of a recent attack there on him.

Marksberry noticed plaintiff squatting in the parking lot of the American Legion, and he radioed dispatch that he was going to investigate a suspicious person. Another Elsmere Police Officer, Steven Robinson, was nearby, heard Marksberry's call, and pulled into the parking lot to provide backup.

Marksberry exited his car and approached plaintiff, while Robinson spoke to Ellis. Marksberry told plaintiff to stand up and asked what he was doing, and plaintiff told him he was "trying to get up phlegm." (Plf. Depo. 34) Marksberry observed that plaintiff was holding a piece of cellophane or tissue that appeared to have a white powdery substance on it. Marksberry, concluding that plaintiff had been attempting to use drugs, asked plaintiff "where the drugs were." Plaintiff said there were no drugs. (Plf. Depo. 35) Marksberry told plaintiff to empty his pockets, and plaintiff pulled kleenex out of them. Marksberry said, "See, there's powder," and plaintiff responded that it was only tissue fuzz. (Plf. Depo. 37) Marksberry then said there was white powder on the ground, and plaintiff stated, "No, sir,

that's bird crap, that's not powder." (*Id.*) Marksberry
testified that plaintiff made this statement in a "smart" tone.
Plaintiff testified that after this point, "the entire situation
and [Marksberry's] demeanor changed." (*Id.*)

Marksberry then said to plaintiff "You're drunk," to which
plaintiff responded that he was not drunk and that he had only
had two beers. (Plf. Depo. 39-40) Marksberry then saw the cup
of Jagermeister and asked plaintiff if it was his, and plaintiff
said it was. Marksberry asked plaintiff if he knew that he was
not supposed to have the drink in the parking lot, and plaintiff
stated that he did not know that. Robinson testified that
plaintiff was unsteady on his feet, had bloodshot eyes, and
smelled of alcohol. Ellis testified, however, that plaintiff did
not appear to be intoxicated.

Marksberry then instructed plaintiff to place his hands on
the top of the patrol car. Marksberry searched plaintiff again
and told him he was under arrest. Plaintiff asked why, and
Marksberry said because he was drunk. (Plf. Depo. 40) Plaintiff
asked to be given a breathalyser or field sobriety test, and
Marksberry refused. Marksberry then handcuffed plaintiff,
grabbing him hard. Plaintiff told Marksberry to be careful
because he had a bad back and hip, and Marksberry "just kind of
laughed." (Plf. Depo. 41) Plaintiff said he wasn't joking, that
he got steroid injections and was on pain medicine. Marksberry

asked what type of medicine plaintiff was taking, and plaintiff
told him Percoset.  (*Id.*)

Marksberry placed plaintiff in his cruiser and transported
him to the Kenton County Detention Center.  On the way,
Marksberry slammed on his brakes at a red light, causing
plaintiff's body to slam into the divider between the front and
back seats.  (Plf. Depo. 56)

When they arrived at the jail around 12:00 a.m., Marksberry
said to plaintiff, "Get out, Sweet Pea," to which plaintiff
responded, "I'm coming, Sweet Pea."  (Plf. Depo. 63)  Plaintiff
testified that, as the two walked down the sidewalk to the jail
entrance, Marksberry lifted plaintiff's hands high up behind his
back, causing plaintiff to rise to his tiptoes and tell
Marksberry to stop because it hurt.  (*Id.*)  Plaintiff testified
that his hip then "gave out" and he fell, prompting Marksberry to
grab him by the back of the handcuffs and "bash" him into the
brick wall.  (Plf. Depo. 64)  Plaintiff began screaming, and
Marksberry dragged him down the ramp and bashed plaintiff into
the brick wall three more times.  Plaintiff testified that his
head hit the wall head-on with some force and he was begging
Marksberry to stop.  (Plf. Depo. 79, 84)  Plaintiff testified
that he lost consciousness and woke to find Marksberry on top of
him, either kneeling or pressing on plaintiff's throat with his
arm.

7

A correctional officer then appeared and helped plaintiff get up. (Plf. Depo. 99) That officer asked Marksberry if he needed help with plaintiff, and Marksberry said no. Marksberry began walking plaintiff through the entrance and again slammed plaintiff into the wall. (Plf. Depo. 101) Plaintiff again screamed, and one of the correctional officers again appeared and said, "I don't know what your all's problems is, but I don't want any problems out of you." (Plf. Depo. 103) Plaintiff told the guard to keep Marksberry "the hell away from me" and "you won't have any problems out of me." (*Id.*)

The correctional officer then walked plaintiff down the hallway and handcuffed plaintiff to a railing. Plaintiff testified that he heard Marksberry tell someone behind the plexiglass not to believe plaintiff "about his bad back." Plaintiff spoke up and said Marksberry was lying and that he did have a bad back and hip. Marksberry then left the building.

Plaintiff testified that he was crying and told the intake woman that he needed to go to the hospital because he had "just pretty much had the crap beat out of me." (Plf. Depo. 106) The woman did not acknowledge plaintiff's request but continued with the intake questions. Plaintiff testified that no one at the jail provided him with any medical attention.

Plaintiff testified that, as a result of the excessive force used by Marksberry, he suffered a fractured right ankle, an

injured left knee, and various bruises and abrasions.  Plaintiff had surgery on his left knee and was under a doctor's care for his ankle.

Plaintiff was released from jail the next day, August 14, 2007, and he went to the emergency room at St. Elizabeth South, where he was treated for a concussion and whiplash.  (Plf. Depo. 132)

Marksberry denies using excessive force against plaintiff, and he testified that plaintiff was verbally aggressive; that plaintiff tried to spit on and bite him; and that plaintiff initiated a physical altercation as Marksberry walked him into the Detention Center.  Marksberry testified that he pushed plaintiff into the wall because plaintiff grabbed Marksberry's fingers through the handcuff chains.  (Marksberry Depo. 149) Marksberry, at the Chief's instruction, went to the hospital for treatment for injuries he alleges he incurred during the altercation with plaintiff.  (Marksberry Depo. 139-40)

Plaintiff was charged with alcohol intoxication, public intoxication, and disorderly conduct and assault on a police officer.  Plaintiff was ultimately not convicted on any of the charges against him.

Plaintiff filed this action on June 9, 2008, alleging claims under 42 U.S.C. § 1983 for unlawful arrest, excessive force, negligent failure to train, negligent hiring and negligent

supervision.  Plaintiff also alleges state law claims for negligent hiring and supervision, assault and battery, and intentional and negligent infliction of emotional distress.

Defendants thereafter moved for partial summary judgment on all federal claims against the City and Marksberry in his official capacity and on the state law claims for negligent hiring and supervision and outrage.  Marksberry also seeks summary judgment on the claim against him in his individual capacity for unlawful arrest.  Marksberry has not moved for summary judgment on the excessive force claim.

### *Analysis*

### A.  <u>Unlawful Arrest – Marksberry</u>

"In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Everson v. Leis*, 556 F.3d 484, 498 (6th Cir. 2009) (quotation omitted).  "A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Id.*  In obtaining such reliable information, "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Id.*  Instead, the officer must consider the totality of the circumstances, "recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest." *Id.* (emphasis in original).

In determining whether an officer had probable cause to make an arrest, the court examines the totality of the circumstances and may consider only the information possessed by the arresting officer at the time of the arrest. *Id.* (citation omitted). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that it required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.* at 499.

"In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Id.* (citation omitted). But under § 1983, "an arresting agent is entitled to qualified immunity if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Id.*

Marksberry argues that he had probable cause to arrest Haley for the offenses of alcohol and public intoxication. KRS 222.202(1), the alcohol intoxication statute, states:

> A person is guilty of alcohol intoxication when he appears in a public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or unreasonably annoys persons in his vicinity.

At the time that Marksberry placed plaintiff under arrest for this offense, he knew that plaintiff had consumed two beers

and had a cup of Jagermeister liquor with him.  However,
plaintiff had not consumed the Jagermeister, and he told
Marksberry that he was bent over because he was "trying to get up
phlegm." (Plf. Depo. 34)  While Marksberry testified that
plaintiff smelled of alcohol (Marksberry Depo. 227) and Robinson
testified that plaintiff "seemed unsteady on his feet" and his
eyes "looked like they were bloodshot" (Robinson Depo. 51), Ellis
testified that she did not believe plaintiff to be under the
influence of drugs or alcohol and that he was not belligerent,
obnoxious, or cursing.  (Ellis Depo. 18)  Marksberry further
testified that plaintiff did not stutter when answering his
questions.  (Marksberry Depo. 242)  Plaintiff also testified that
he told Marksberry he was not drunk and asked that he be given a
field sobriety or breathalyzer test, which Marksberry declined to
perform.  (Plf. Depo. 40, 46)

It is important to note that the above statute requires not
only that the person have consumed alcohol, but that he be
"manifestly under the influence of alcohol *to the degree that he
may endanger himself or other persons or property, or
unreasonably annoys persons in his vicinity*." KRS 222.202(1)
(emphasis added).  There is no evidence that, at the time that
Marksberry arrested plaintiff, he was causing any disturbance or
annoying anyone.  Moreover, the consumption of two beers – which
plaintiff candidly admitted to Marksberry – would not necessarily

cause a reasonable officer to believe that the person posed a danger to himself or others. Certainly, Marksberry did not testify that he perceived such a risk from plaintiff. Finally, plaintiff testified that he asked that he be given a field sobriety or breathalyzer test, which Marksberry declined.

Given the totality of these circumstances, the court concludes that a jury question exists as to whether Marksberry had probable cause to arrest plaintiff for violation of KRS 222.202(1), and that issues of fact as outlined above prevent a grant of qualified immunity on the false arrest claim.

After Marksberry had placed plaintiff under arrest for alcohol intoxication, plaintiff told him about his hip problem, that he saw a doctor for it, and was on pain medicine. Marksberry asked plaintiff what kind of medicine it was, and plaintiff told him Percoset. Based on this information, Marksberry also charged plaintiff with public intoxication. If Marksberry had probable cause for this charge, then he is entitled to qualified immunity on plaintiff's false arrest claim even though he may have lacked probable cause for the first charge. *See Avery v. King*, 110 F.3d 12, 14 (6th Cir. 1997).

KRS 525.100, the public intoxication statute, states:

A person is guilty of public intoxication when he appears in a public place manifestly under the influence of a controlled substance, or other intoxicating substance, excluding alcohol (unless the alcohol is present in combination with any of the above), **not therapeutically administered**, to the degree that he may endanger himself or

other persons or property, or unreasonably annoy persons in
his vicinity.

*Id.* (emphasis added).  As the highlighted language indicates,
plaintiff's conduct would not fall within the purview of this
statute because the controlled substance he was taking was
prescribed by a doctor and was thus "therapeutically
administered," a fact that he conveyed to Marksberry.

Further, as already noted, there is no evidence that
plaintiff's conduct appeared to make him a risk to himself or
others.

Therefore, a jury question also exists as to whether a
reasonable officer could have believed that he had probable cause
to charge plaintiff with public intoxication.

### B.   Negligent Hiring and Supervision (Federal) – City of Elsmere

In *Bd. of the County Comm. of Bryan County, Oklahoma v.
Brown*, 520 U.S. 397 (1997), the Supreme Court considered the
principles underlying § 1983 municipal liability for allegedly
inadequate review of a police officer's record in the hiring
process, setting forth the standard for such claims:

> Where a plaintiff presents a § 1983 claim premised upon the
> inadequacy of an official's review of a prospective
> applicant's record, however, there is a particular danger
> that a municipality will be held liable for an injury not
> directly attributable to the municipality itself.  Every
> injury suffered at the hands of a municipal employee can be
> traced to a hiring decision in a "but-for" sense: But for
> the municipality's decision to hire the employee, the
> plaintiff would not have suffered the injury.  **To prevent
> municipal liability for a hiring decision from collapsing**

14

into *respondeat superior* liability, a court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged.

. . . .

**The fact that inadequate scrutiny of an applicant's background would make a violation of rights more** *likely* **cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation.** After all, a full screening of an applicant's background might reveal no cause for concern at all; if so, a hiring official who failed to scrutinize the applicant's background cannot be said to have consciously disregarded an obvious risk that the officer would subsequently inflict a particular constitutional injury.

. . . .

But this showing of an instance of inadequate screening is not enough to establish "deliberate indifference." In layman's terms, inadequate screening of an applicant's record may reflect "indifference" to the applicant's background. For purposes of a legal inquiry into municipal liability under § 1983, however, that is not the *relevant* "indifference." **A plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."**

*Id.* at 410-11 (bold added).

The Court added that the "connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." *Id.* at 412. Thus, to test the link between the municipal official's hiring decision and the

15

plaintiff's injury, the court must ask whether a full review of the police officer's record reveals that the municipal official "should have concluded that [the police officer's] use of excessive force would be a plainly obvious consequence of the hiring decision." *Id.* at 412-13.

Applying these principles, the Court held that no municipal liability attached where a sheriff failed to conduct an adequate review of a deputy's background before hiring him. The deputy used excessive force during an arrest, breaking the plaintiff's kneecaps in the process. Although the sheriff obtained the deputy's driving and criminal background records, he admitted that he did not closely review either. *Id.* at 401. These records reflected that the deputy had a record of driving infractions and had pleaded guilty to various driving-related and other misdemeanors, including assault and battery, resisting arrest, and public drunkenness.

Assuming that the sheriff's assessment of the deputy's background was inadequate, the Court held nonetheless that such evidence raised no triable issue as to municipal liability because it did not demonstrate that the sheriff's isolated decision "reflected a conscious disregard for a high risk that [the deputy] would use excessive force in violation of respondent's federally protected right." *Id.* at 415-16.

Here, plaintiff's federal claim based on the City's

allegedly inadequate review of Marksberry's background fails as a matter of law because his background did not make it "patently obvious" that Marksberry would make an unlawful arrest or employ excessive force, so as to satisfy the test set forth in *Brown*.

Cummins reviewed Marksberry's criminal background and his personal statement, which revealed that Marksberry had no criminal background except for having been charged as a minor with possession of alcohol, and that charge was dismissed. Marksberry also admitted to having used illegal drugs but stated that it had been some years since he last did so, and Cummins knew that Marksberry had passed the drug test administered by Grant County. Cummins also had Marksberry undergo a psychological evaluation, which raised no red flags concerning violent behavior. None of this information indicated that Marksberry posed a high risk of using excessive force.

Plaintiff argues that Cummins should have reviewed Marksberry's personnel file at the Grant County Detention Center, citing Marksberry's involvement in prisoner complaints that led to civil lawsuits against the jail as evidence that Marksberry posed a risk of using excessive force. This argument is unavailing.

First, plaintiff cites no authority that failure to review the actual personnel file from a prior employer constitutes an inadequate hiring review, when the hiring official has contacted

17

the applicant's supervisor from that job and is told that the applicant was a good employee with whom he had no problems, as Grant County Jailer Steve Kellam told Cummins here. There is no evidence that Cummins acted with deliberate indifference to any risk in failing, effectively, to second guess Kellam's assessment of Marksberry. And importantly, plaintiff has put into this record no evidence – as opposed to arguments in his brief – as to what information was actually contained in Marksberry's Grant County personnel file or how it might have altered Cummins's decision had be obtained it.

Second, Kellam <u>did</u> inform Cummins that Marksberry had been named a defendant in lawsuits involving excessive force, and he further informed Cummins that the FBI had investigated Marksberry and found that no criminal charges against him were warranted. Kellam gave Cummins a copy of the letter from the Justice Department containing that conclusion. Given this fact, a reasonable person could not conclude that Kellam's failure to inquire further into the civil lawsuits against Grant County constitutes deliberate indifference.

Plaintiff also argues that the information about Marksberry's use of illegal drugs shows that Cummins's hiring decision was inadequate, but there is no evidence, as required by *Brown*, that such facts indicate that Marksberry posed a "patently obvious" risk of using excessive force. As noted in *Brown*, the

connection between the applicant's background and the specific constitutional violation alleged "must be strong," and the Court there held that even a prior conviction for assault and battery did not demonstrate a propensity to use excessive force. *Brown*, 520 U.S. at 412. Here, plaintiff cannot demonstrate that the fact that Marksberry had used illegal drugs in the past made him a risk for the use of excessive force. As such, the requisite causation is lacking. *See, e.g., Doe v. Magoffin County Fiscal Court*, 174 Fed. App'x 962, 967 (6th Cir. 2006) (rejecting § 1983 claim by juvenile raped by courthouse custodian who had criminal record which the county did not check prior to his hire; crimes with which he was charged did not make it "plainly obvious" that he would commit sexual assault); *Jefferson County, Ky. v. Lindsay*, No. 96-5840, 1997 WL 602573, at *5 (6th Cir. Sept. 29, 2997) (noting that *Brown* requires a "direct causal link" between governmental bodies' alleged action or inaction and particular injury suffered by plaintiff).

Finally, the claim for negligent supervision fares no better. There is no evidence that the City had any policy or custom of condoning excessive force, nor is there any evidence that Marksberry had done anything after his hire to raise a red flag about his behavior. Plaintiff thus cannot satisfy the same stringent "deliberate indifference" standard that applies to this claim. *See generally Mize v. Tedford*, No. 09-1775, 2010 WL

1655835, at *2-*3 (6th Cir. Apr. 26, 2010) (discussing § 1983 "failure to supervise" claim).

The City of Elsmere is thus entitled to summary judgment on these claims.

### C. Negligent Hiring and Supervision (State)

Under Kentucky law, claims for negligent hiring and retention "require that an employer use reasonable care in the selection or retention of its employees." *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 732 (Ky. 2009) (citing *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. App. 1998)). The employer may not be liable under a theory of *respondeat superior*; rather, "the employer's liability may only be predicated upon its own negligence in failing to exercise reasonable care in the selection or retention of its employees." *Id.*

To prove a claim of negligent hiring under Kentucky law, the plaintiff must prove that: "(1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff." *Id.* at 733 (citing *Flor-Shin*, 964 S.W.2d at 442). This concept of foreseeability is evaluated under the totality of the circumstances. *Id.* at 735.

As discussed above, Cummins performed what can only be characterized as a reasonable review of Marksberry's background

prior to hiring him, contacting and personally speaking with both supervisors and co-workers from Marksberry's prior jobs in law enforcement over the preceding six years. The uniform assessment of these individuals was that Marksberry was a good employee with no significant performance problems. Cummins also obtained information that Marksberry had been cleared by the Justice Department of any criminal wrongdoing in the Grant County Detention Center matters. Further, Cummins required that Marksberry undergo a psychological evaluation, which likewise cleared him for employment as a police officer. As to "fitness" for the job in terms of qualifications, it is undisputed that Marksberry was KLEC certified and had completed the required annual training for such. None of this information indicated that Marksberry was unfit for the job or posed a risk of harm to third parties.

As a matter of law, therefore, plaintiff cannot show that the City of Elsmere failed to exercise reasonable care in its hiring of Marksberry.[3]

### D. Intentional Infliction of Emotional Distress

Under Kentucky law, when damages for emotional distress are available through a traditional state tort claim, and the conduct was not intended only to cause extreme emotional distress, a

---

[3]Likewise, plaintiff has identified no information that came to the City's attention after it hired Marksberry that would form for the basis for a negligent supervision claim.

claim for the tort of intentional infliction of emotional distress ("outrage") will not lie. *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993).

In *Rigazio*, the court held that the plaintiff, who had been sexually abused by a priest, could not recover against the priest for outrage because plaintiff could recover damages for emotional distress as part of his claims for common law assault and battery, which he had pled. The court stated:

> Taking into account the history of the tort of outrage, and its reason for being as a "gap-filler" providing redress for extreme emotional distress in those instances in which the traditional common law actions did not, we believe that § 47 [of the Restatement (Second) of Torts] recognizes that where an actor's conduct amounts to the commission of one of the traditional torts such as assault, battery, or negligence for which recovery for emotional distress is allowed, and the conduct was not intended only to cause extreme emotional distress in the victim, the tort of outrage will not lie. Recovery for emotional distress in those instances must be had under the appropriate traditional common law action. The tort of outrage was intended to supplement the existing forms of recovery, not swallow them up.

*Id.* at 298-99.

Courts in Kentucky have continued to apply the distinction set forth in *Rigazio*. *See, e.g., Childers v. Geile*, No. 2008-CA-002114-MR, 2009 WL 3672891, at *4 (Ky. App. Nov. 6, 2009) (trial court properly dismissed outrage claim where defendants' alleged conduct amounted to medical malpractice, even though plaintiffs had voluntarily dismissed that claim); *Chambers v. Haas*, No. 2008-CA-001546-MR, 2009 WL 3400641, at *3 (Ky. App. Oct. 23, 2009) (similar); *Doe v. Suroor*, No. 3:05CV-728-H, 2007 WL

1651993, at *1 (W.D. Ky. June 6, 2007) (plaintiff cannot maintain claim for outrage where she alleges torts of sexual assault and assault and battery).

Plaintiff's reliance on *Brewer v. Hillard*, 15 S.W.3d 1 (Ky. App. 1999), to overcome the *Rigazio* rule is unavailing. In *Brewer*, the court held that the plaintiff could maintain a claim for outrage based on allegations that the defendant subjected him to explicit and offensive same-sex verbal harassment. Based on the nature of the harassment, the court concluded that a jury could find that the defendant's sole intent was to harm plaintiff emotionally; indeed, the defendant testified that he did *not* take any of the actions for sexual gratification. *Id.* at 8.

Here, however, plaintiff has pled claims for assault and battery, the traditional torts at issue in *Rigazio* which the court there found could not be supplanted by a claim for outrage. Unlike the defendant in *Brewer*, there is no evidence that Marksberry acted with the sole intent to cause plaintiff emotional harm. Rather, if proven, the facts alleged would show that Marksberry acted with the intent of inflicting physical pain on plaintiff.

The claim for outrage thus fails as a matter of law.

Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

**IT IS ORDERED** that the motion of defendants for partial summary judgment (Doc. 47) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**, in accordance with the above discussion.

This 31st day of August, 2010.



Signed By:

*William O. Bertelsman* WOB

**United States District Judge**